**GET IN SHAPE FRANCHISE, INC., Plaintiff**

v.

**TFL FISHERS, LLC; Rosalyn R. Harris; Thinner for Life, Inc.; and Fit Chicks, LLC, Defendants.**

**Civil Action No. 15-12997-PBS**

United States District Court, D. Massachusetts.

Signed 03/09/2016

Kathleen E. Ceglarski, Lee A. Harrington, Nixon Peabody LLP, Boston, MA, for Plaintiff.

Rosalyn R. Harris, Fishers, IN, pro se.

## MEMORANDUM AND ORDER

Saris, Chief Judge.

## INTRODUCTION

This case involves a dispute between a franchisor of small group fitness studios for women and a former franchisee. Plaintiff Get In Shape Franchise, Inc. (GISFW) is a Massachusetts corporation with more than eighty franchise locations in sixteen states across the country that do business under the name "Get In Shape For Women." GISFW brings this action against a former franchisee, TFL Fishers, LLC, alleging trademark infringement, breach of contract, breach of the covenants of good faith and fair dealing, unjust enrichment, unfair competition, and fraud. Defendant TFL Fishers, LLC, is an Indiana limited liability company; Defendant Rosalyn R. Harris is an Indiana resident and the president and sole member of TFL Fishers. Ms. Harris signed a franchise agreement with GISFW as the president of TFL Fishers in April 2013.

Ms. Harris owned and operated a GISFW studio in Fishers, Indiana pursuant to the franchise agreement for just over two years before terminating the agreement via email in June 2015. Shortly before termination, she filed the necessary paperwork with the State of Indiana to register Defendant Fit Chicks, LLC—an Indiana limited liability company owned by Ms. Harris's sister, Constance Harris.[1]

---

1. Defendant, Thinner For Life, Inc., was an Indiana corporation owned and operated by

Upon termination of the franchise agreement, Rosalyn Harris sold all the equipment and machines in the Fishers studio to her sister for $1, and began operating the studio under the name "Fit Chicks." Rosalyn Harris currently serves as a full-time, volunteer manager at Fit Chicks.

GISFW now moves for a preliminary injunction enjoining the defendants from operating the allegedly competing business Fit Chicks, and from using GISFW's confidential information, in violation of the franchise agreement. Rosalyn Harris appears *pro se*, and argues that the Court should dismiss the case for lack of subject matter jurisdiction, lack of personal jurisdiction, and improper venue. Alternatively, she argues that the Court should deny GISFW's motion for a preliminary injunction on the grounds that GISFW failed to establish a likelihood of success on the merits, and failed to establish that it will suffer irreparable harm if the motion is denied. The other defendants have not appeared in the case.

After hearing,[2] the Court **DENIES** Ms. Harris's motion to dismiss for lack of subject matter jurisdiction, lack of personal jurisdiction, and improper venue (Docket No. 22), and **ALLOWS** in part GISFW's motion for a preliminary injunction (Docket No. 6) as against Ms. Harris. The Court

further **TRANSFERS** the case to the Southern District of Indiana under 28 U.S.C. § 1404(a) and 28 U.S.C. § 1406(a).

## FACTS

The following facts are taken from the Complaint (Docket No. 1), the deposition of Rosalyn Harris (Docket No. 47, Ex. 1), and the operative franchise agreement (Docket No. 50, Ex. 1). They are undisputed, except where stated otherwise.

### I. The Warm-Up

On April 1, 2013, Ms. Harris, in her capacity as president of TFL Fishers, LLC, entered into a written franchise agreement with GISFW authorizing TFL Fishers to own, operate, and do business as "Get In Shape For Women" in Fishers, Indiana. Ms. Harris agreed to pay a transfer fee of $14,500 to GISFW through a one-year financing arrangement to assume rights to the Fishers, Indiana territory through July 28, 2020.[3] Shortly thereafter, she assumed operation of a GISFW studio located at 11720 Olio Road, Suite 800, Fishers, Indiana.

Pursuant to the franchise agreement, Ms. Harris agreed to pay GISFW six percent of gross sales as royalties; to operate the studio in compliance with all GISFW systems and standards; to only use the

---

Ms. Harris from 2012 to 2015; it was administratively dissolved in May 2015.

2. The Court held an initial hearing on GISFW's motion for a preliminary injunction on September 21, 2015, at which Ms. Harris appeared telephonically. I allowed limited, preliminary discovery on jurisdictional issues. The Court then held a second hearing on the motion for a preliminary injunction and Ms. Harris's motion to dismiss on December 15, 2015. Ms. Harris appeared at the second hearing via video conference from the federal courthouse in Indianapolis, Indiana because she said she could not afford to appear in Massachusetts. Ms. Harris has an MBA from the University of Virginia, Darden School of

Business. In light of Ms. Harris's *pro se* status, the Court construes her motion and briefs liberally, and does not strictly adhere to labeling requirements. See Erickson v. Pardus, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); Castro v. United States, 540 U.S. 375, 381–82, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003).

3. GISFW had previously granted the rights to the Fishers territory to a third party, Van Wye Companies, LLC, under a ten-year contract. Ms. Harris assumed the rights for the remainder of the original contract term, from 2013 to 2020. Under the agreement, she had the right to renew the franchise for two additional five-year terms.

GISFW system, names, and marks for the operation of the studio; and to attend an annual conference and various training sessions in Massachusetts, including a management training program called "Franchise School." Ms. Harris attended five days of Franchise School at the GISFW corporate office in Needham, Massachusetts in 2013, at the start of the franchise relationship. Ms. Harris also acknowledged in the agreement that she obtained "knowledge of proprietary matters, techniques, and business procedures of Franchisor that are necessary and essential to the operation of the Studio," which she did not know prior to execution of the contract. Docket No. 50, Ex. 1 ¶ 10(a).

The franchise agreement also contains a covenant not to compete, grants GISFW the right of first refusal should the franchisee receive an offer to purchase the studio, and outlines detailed post-termination procedures in the event that one of the parties terminates the agreement. More specifically, section 13 of the franchise agreement prohibits the franchisee from "directly or indirectly" owning, maintaining, operating, engaging in, being employed by, or otherwise having any interest in "any fitness center, health club, personal training studio, or any other business concepts that directly compete with Get In Shape For Women® within an 8 mile radius" of the studio, or any other GISFW location, for two years following termination of the agreement. Docket No. 50, Ex. 1 ¶ 13(b). Section 13 specifically lists "starting any new business in competition with [GISFW]," "[a]ssisting in starting any new business in competition with [GISFW]," and "[s]oliciting franchisees or clients from [GISFW]" as examples of prohibited competitive activities. Id.

Section 16(d) requires the franchisee to notify GISFW of any bona fide written offers to purchase the studio, grants GISFW the right to purchase the studio itself for the same price and on the same terms as the offer, and requires the franchisee to obtain GISFW's prior written approval for any sale. Id. ¶ 16(d). Section 18 of the agreement specifies the duties and obligations of the franchisee upon termination of the agreement, including requirements to cease using the GISFW system and "confidential methods, procedures, descriptions of products, and techniques;" turn over all customer lists, records, and files; cease holding itself out as a present or former GISFW franchisee; and comply with the covenant not to compete. Id. ¶ 18(a)-(b), (e). Section 18 also grants GISFW the right to purchase "any or all inventory, equipment, supplies, signs, advertising materials, and items bearing Franchisor's Names and Marks, at fair market value," and to assume the lease for the studio location, upon termination. Id. ¶ 18(f)-(g).

Finally, section 19 contains an arbitration clause, choice-of-law provision, forum-selection clause, and attorneys' fees provision. Section 19(c) states:

Except insofar as Franchisor elects to enforce this Agreement by judicial process, injunction, or specific performance (as hereinabove provided), all disputes and claims relating to any provision hereof, any specification, standard or operating procedure, or any other obligation of Franchisee prescribed by the Franchisor, or any obligation of Franchisor, or the breach thereof (including without limitation, any specification, standard or operating procedure or any other obligation of Franchisee or Franchisor, which is illegal or otherwise unenforceable or voidable under any law, ordinance, or ruling) shall be settled by mandatory binding arbitration in Norfolk County, Massachusetts . . . .

Id. ¶ 19(c). Section 19(g) contains the choice-of-law provision and forum-selection

clause: "Except to the extent governed by the U.S. Trademark Act of 1946 (Lanham Act, 15 U.S.C. Section 1501 et. seq.) or the U.S. Arbitration Act, this Agreement shall be governed by the laws of the State of Massachusetts, and venue shall lie in Norfolk County, Massachusetts." Id. ¶ 19(g). Section 19(h) specifies that the franchisor "shall be entitled to recover reasonable attorneys' fees and court costs" from the franchisee in the event that it "incurs legal fees in enforcing" the franchise agreement. Id. ¶ 19(h).

Significantly, there is an "Indiana Addendum to the Franchise Agreement," which states that, notwithstanding anything to the contrary in the agreement, "the laws of the State of Indiana supersede any provisions in the offering circular, the Agreement, or the State of Incorporation law, if these provisions are in conflict with Indiana law." Docket No. 50, Ex. 1 at 130. The Indiana Addendum further specifies that "any provision in the Agreement which limits in any manner whatsoever litigation brought for breach of the Agreement will be void to the extent that [it] . . . violates the Indiana Deceptive Franchise Practices Law." Id.

## II. The Cool Down

The relationship between GISFW and Ms. Harris appears to have started to cool down in early 2015. In May, Ms. Harris failed to attend a mandatory training program and failed to participate in a mandatory postcard-marketing program required by the franchise agreement. On June 24, 2015, Ms. Harris sent an email to Louis DeFrancisco, president of GISFW, notifying GISFW that she had sold the assets of the Fishers studio to a third party and was closing the studio. GISFW emailed her back and asked to speak with her immediately to discuss the contractual and legal issues involved with the closing, but Ms. Harris did not respond. On June 30, 2015, GISFW learned that the Fishers studio

had not closed, but was now operating under the name "Fit Chicks."

A photo taken on June 30, 2015, revealed that the GISFW building sign had only been partially covered by a tarp sign reading "Fit Chicks," and that an A-frame marketing sign displaying the GISFW name and logo remained in place out front of the studio. Ms. Harris admits that she did not remove the GISFW building sign until July 27, 2015, and that the GISFW A-frame sign remained out front of the studio for at least two weeks after she began operating as Fit Chicks. She has now replaced both with Fit Chicks signs. Ms. Harris also initially continued to display the GISFW name and logo on her website, http://coachrozharris.com, and used a GISFW Facebook page to market Fit Chicks after the studio sale. Ms. Harris is no longer using the GISFW Facebook page, and has removed all references to GISFW from her website.

## III. Stretching Out

Ms. Harris filed the Articles of Organization for Fit Chicks, LLC, with the Indiana Secretary of State on June 18, 2015, which became effective on July 1, 2015. The entity's address is 11720 Olio Road, Suite 800, Fishers, Indiana, which is the same location as the former GISFW studio. Ms. Harris is listed as the registered agent, and there are no other officers, managers, or principals listed as affiliated with Fit Chicks. Her personal home address and phone number are listed on Fit Chicks's business tax application filed with the State of Indiana.

Ms. Harris testified at her deposition that her sister, Constance Harris, owns Fit Chicks. When Rosalyn Harris stopped operating the Fishers location as a GISFW studio, she sold all the equipment in the studio—including treadmills, ellipticals, dumbbells, weight machines, and a desktop

computer—to her sister for $1. Ms. Harris also testified that Fit Chicks is honoring all the pre-paid customer contracts from the time when the studio operated under the GISFW name. Meanwhile, GISFW contends that it has received complaints from former customers that Ms. Harris has increased the per-session training price and denied customers refunds. Both parties agree that Fit Chicks is now servicing many of the same clients from the time when the studio operated as a GISFW franchise.

Ms. Harris's sister lives in Atlanta, Georgia, where she has a full-time job as a real estate accountant. She does not have a background in fitness or nutrition, and does not spend any time in the Fit Chicks studio on a weekly basis. According to Rosalyn Harris, her sister spends roughly ten hours per week working on Fit Chicks matters remotely.

Ms. Harris currently serves as the "volunteer manager" for the Fit Chicks studio; she volunteers in this capacity forty hours per week. Harris Dep., Docket No. 47, Ex. 1 at 72:10-15. As the "volunteer manager," she runs the day-to-day operations of the studio, including soliciting clients, engaging in marketing activities, paying the studio's rent and bills, and occasionally training clients and consulting with clients on nutrition. Ms. Harris has access to Fit Chicks's bank accounts, and is authorized to sign checks on behalf of Fit Chicks. She developed the workout program used in the Fit Chicks studio. Her office for her separate life coaching business is located in the studio, and the lease to the studio space is under her name alone. She pays the rent for the studio space each month, and is reimbursed by Fit Chicks. She is not paid for her work as a volunteer manager, but she is occasionally paid when she serves as a trainer for clients. Ms. Harris intends to continue serving as a volunteer manager until at least July 2016. The head personal trainer at the studio, Kelli Price, also serves as an assistant manager, and works in the studio roughly forty hours per week. There are two other staff members associated with Fit Chicks: another personal trainer and an unpaid intern.

On June 30, 2015, GISFW sent Ms. Harris three written notices: (1) a cease and desist letter demanding that Ms. Harris cease operation of the Fit Chicks studio and comply with the termination procedures in the franchise agreement, (2) a demand for payment of $44,973.56 for future royalties due to GISFW for the remainder of the contract term (through July 28, 2020) and $14,500 for the transfer fee that would have been paid to GISFW if Ms. Harris had complied with the franchise agreement procedures for a studio sale, and (3) a for-cause termination notice outlining the ways in which Ms. Harris has allegedly breached the franchise agreement. For example, GISFW alleges that Ms. Harris used a separate credit card processing application, instead of the web-based reporting application required by the franchise agreement, in order to underreport gross sales, and thereby reduce the royalty payments due to GISFW. Ms. Harris responded to these notices by simply stating that she does not own Fit Chicks. GISFW filed the current action shortly thereafter on July 21, 2015, and moved for a preliminary injunction one week later.

## DISCUSSION

### I. Subject Matter Jurisdiction

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff has the burden of establishing that subject matter jurisdiction exists. See Calderon–Serra v. Wilmington Trust Co., 715 F.3d 14, 17 (1st Cir.2013). "When a district court considers a Rule 12(b)(1) motion, it must credit the

plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor." Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir.2010). "The district court may also consider whatever evidence has been submitted, such as the depositions and exhibits." Id. (internal quotation marks and citations omitted); see also Carroll v. United States, 661 F.3d 87, 94 (1st Cir.2011) ("In evaluating a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, we construe plaintiffs' complaint liberally and ordinarily may consider whatever evidence has been submitted, such as depositions and exhibits." (internal quotation marks and citations omitted)).

Here, GISFW argues that the Court has federal question jurisdiction because the case involves a claim for trademark infringement, and thus arises under the Lanham Act, 15 U.S.C. §§ 1051-1128. Alternatively, GISFW alleges that the Court has diversity jurisdiction under 28 U.S.C. § 1332 because the amount in controversy is reasonably likely to exceed $75,000 and the parties are citizens of different states. Ms. Harris contends that the Court lacks subject matter jurisdiction because she has ceased using GISFW's marks, and the amount in controversy cannot possibly exceed $75,000.

## A. Federal Question Jurisdiction

Under 28 U.S.C. § 1338, district courts "have original jurisdiction of any civil action arising under any Act of Congress relating to ... trademarks," and of "any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the ... trademark laws." 28 U.S.C. § 1338(a)-(b). The Lanham Act also provides for federal jurisdiction over trademark actions arising under the statute: "The district and territorial courts of the United States shall have original jurisdiction ... of all actions arising under this chapter, without regard to the amount in controversy or to diversity or lack of diversity of citizenship of the parties." 15 U.S.C. § 1121.

■ Given that 28 U.S.C. § 1338 and 15 U.S.C. § 1121 use the same "arising under" language as the general federal question statute, 28 U.S.C. § 1331, courts apply a similar analysis to determine whether a case arises under federal trademark law. See Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 807–09, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (applying the 28 U.S.C. § 1331 analysis to a patent law case under 28 U.S.C. § 1338); Duncan v. Stuetzle, 76 F.3d 1480, 1485–86 (9th Cir.1996) (applying the 28 U.S.C. § 1331 analysis to a trademark law case). Jurisdiction under 28 U.S.C. § 1338 and the Lanham Act extends "only to those cases in which a well-pleaded complaint establishes either that federal [trademark] law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal [trademark] law, in that [trademark] law is a necessary element of one of the well-pleaded claims." Christianson, 486 U.S. at 809, 108 S.Ct. 2166.

■ The underlying facts in trademark cases often give rise to claims alleging both violations of the Lanham Act under federal law and breach of contract under state law. See, e.g., Mother Waddles Perpetual Mission, Inc. v. Frazier, 904 F.Supp. 603, 607 (E.D.Mich.1995); Foxrun Workshop, Ltd. v. Klone Mfg., Inc., 686 F.Supp. 86, 87–88 (S.D.N.Y.1988). The mere existence of a trademark does not confer jurisdiction over a contract dispute. Mother Waddles, 904 F.Supp. at 607.

■ A suit arises under federal trademark law "if the complaint is for a remedy expressly granted by the Act," such as a suit for infringement. T.B. Harms Co. v. Eliscu, 339 F.2d 823, 828 (2d Cir.1964)

(Friendly, J.); see also Royal v. Leading Edge Prods., Inc., 833 F.2d 1, 2 (1st Cir. 1987) (adopting the T.B. Harms test). Courts differentiate between suits that merely involve disputes "over royalty payments or the sufficiency of payments under a license agreement," which do not constitute federal claims, and cases alleging damage to a trademark's reputation. Mother Waddles, 904 F.Supp. at 608, 610.

■ Here, GISFW has alleged violations of the Lanham Act, and claims damage to the trademark's reputation. GISFW argued that the defendants' marketing and promotion of Fit Chicks at the Fishers studio, while continuing to display the GISFW name and logo, was likely to cause confusion, mistake, or deception by suggesting that the Fit Chicks studio meets the quality standards that GISFW requires of its franchisees. GISFW further alleged that this use of its name and logo "cause[d] dilution and disparagement of the distinctive quality of the Get In Shape Name and GISFW Marks." Docket No. 1 at 12. Ms. Harris does not deny that she continued to display the GISFW logo and marks out front of the studio, and on her website, after she began operating as Fit Chicks. Given the alleged damage to the GISFW trademark's reputation, the Court has subject matter jurisdiction under 28 U.S.C. § 1338 and 15 U.S.C. § 1121.

The above analysis holds true even if Ms. Harris has ceased to use the GISFW name and logo at the Fit Chicks studio and on her website. Although cessation might make a request for an injunction moot, it does not affect the fact that the plaintiff claims injury to the trademark itself, a claim that gives rise to federal jurisdiction. See Mother Waddles, 904 F.Supp. at 611.

**B. Diversity Jurisdiction**

■ The Court also has diversity jurisdiction under 28 U.S.C. § 1332. District courts have "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different states." 28 U.S.C. § 1332(a)(1). The parties agree that this case is between citizens of different states,[4] but dispute whether the case satisfies the $75,000 amount-in-controversy requirement.

■ The Supreme Court outlined the now "longstanding test for determining whether a party has met the amount-in-controversy minimum" in St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288–89, 58 S.Ct. 586, 82 L.Ed. 845 (1938):

> The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.

Spielman v. Genzyme Corp., 251 F.3d 1, 5 (1st Cir.2001) (describing and quoting St. Paul, 303 U.S. at 288–89, 58 S.Ct. 586). "Under St. Paul, a plaintiff's general allegation of damages that meet the amount requirement suffices unless questioned by

---

4. Under 28 U.S.C. § 1332(c)(1), "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." GISFW is a citizen of Massachusetts because it is incorporated in the Commonwealth and has its principal place of business in Need-ham, Massachusetts. Ms. Harris is a resident and citizen of Indiana. The citizenship of a limited liability company is determined by the citizenship of all its members. See Pramco, LLC. v. San Juan Bay Marina, Inc., 435 F.3d 51, 55–56 (1st Cir.2006). Given that Ms. Harris is the sole member of TFL Fishers, LLC, TFL Fishers is also a citizen of Indiana.

the opposing party or the court." Id. at 5; see also Abdel–Aleem v. OPK Biotech LLC, 665 F.3d 38, 41 (1st Cir.2012).

 Once the opposing party challenges the amount, "the party seeking to invoke jurisdiction has the burden of alleging with sufficient particularity facts indicating that it is not a legal certainty that the claim involves less than the jurisdictional amount." Id. "A party may meet this burden by amending the pleadings or by submitting affidavits." Dep't of Recreation & Sports of P.R. v. World Boxing Ass'n, 942 F.2d 84, 88 (1st Cir.1991). "Courts determine whether a party has met the amount-in-controversy requirement by looking to the circumstances at the time the complaint is filed." Spielman, 251 F.3d at 5 (internal quotation marks and citations omitted).

 Here, Ms. Harris challenges GISFW's general assertion that the amount-in-controversy requirement is satisfied. In the Complaint, GISFW does not state a particular amount in controversy, but argues it is "reasonably likely to exceed the value of $75,000." Docket No. 1 ¶ 2. First, GISFW alleges damages for breach of contract due to the defendants' "under reporting of gross sales during operation, and unapproved closing of the Fishers Studio." Id. ¶ 39. GISFW does not specify an amount by which Ms. Harris allegedly underreported sales, but if Ms. Harris had complied with the termination procedures in the franchise agreement, GISFW would have collected $14,500 from the sale of the studio to a third party.

Next, GISFW contends that, as a result of the "unauthorized termination of the TFL Franchise Agreement, GISFW will not be able to collect royalty payments for the remainder of the agreement," through the termination date of July 28, 2020. Id. ¶ 67. In a demand notice sent to Ms. Harris on June 30, 2015, GISFW calculated the expected royalties for the remainder of the contract period to be $44,973.56. Id. Ex. E at 7.[5] Thus, GISFW has alleged damages of at least $59,000, which does not include any money owed due to the alleged underreporting of gross sales. If Ms. Harris did underreport, then she would potentially owe GISFW even more money as part of the six-percent royalty on sales for the remainder of the contract term.

 Even though attorneys' fees are typically excluded from the amount-in-controversy determination, there are two exceptions to this rule: "when the fees are provided for by contract, and when a statute mandates or allows payment of the fees." Spielman, 251 F.3d at 7. Here, section 19(h) of the franchise agreement states that GISFW is "entitled to recover reasonable attorneys' fees" from the franchisee in the event that it "incurs legal fees in enforcing" the agreement. Docket No. 50, Ex. 1 ¶ 19(h).

Given GISFW's alleged contract damages of $59,000, and the fact that GISFW is entitled to attorneys' fees under the franchise agreement, it does not "appear to a legal certainty" that the state-law claims are really for less than the jurisdictional amount. St. Paul, 303 U.S. at 288–89,

---

5. This number is based on the reported average monthly sales of the Fishers studio from the time when it operated as a GISFW franchise. GISFW multiplied the average monthly sales figure of $12,089 by the sixty-two remaining months in the contract term from June 2015, when Ms. Harris allegedly breached the franchise agreement, through July 2020 to get $749,518 in expected sales. Under the franchise agreement, GISFW was entitled to a six-percent royalty, which would be $44,971.08. GISFW does not explain the small discrepancy between this number and the figure provided in its demand notice: $44,973.56.

58 S.Ct. 586. Ms. Harris raises the interesting arguments that the $59,000 number should be discounted to net present value and offset by the damages she alleges for breach of contract in her counterclaims, but none of these arguments undercuts the damages sought to a legal certainty. Thus, the Court has subject matter jurisdiction over this case under 28 U.S.C. § 1338, 15 U.S.C. § 1121, and 28 U.S.C. § 1332.

## II. Personal Jurisdiction

### A. Legal Standard

On a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of proving that the Court has personal jurisdiction over the defendants. Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50 (1st Cir.2002). The district court "may choose from among several methods for determining whether the plaintiff has met this burden." Id. at 50–51; Adelson v. Hananel, 510 F.3d 43, 48 (1st Cir.2007). The most conventional method is the prima facie method, which "permits the district court to consider only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." Daynard, 290 F.3d at 51; Adelson, 510 F.3d at 48. The prima facie method is appropriate here because the parties do not contest the facts essential to establish personal jurisdiction. See Foster–Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145 (1st Cir.1995) (describing the "prima facie," "preponderance-of-the-evidence," and "likelihood" standards, and in-

dicating the latter two are applicable in "closer, harder-to-call cases, particularly those that feature conflicting versions of the facts").

GISFW proceeds under a theory of specific (as opposed to general) jurisdiction: the jurisdictional basis for GISFW's suit arises from and is limited to the defendants' suit-related conduct. To establish personal jurisdiction, GISFW "must show that the Massachusetts long-arm statute grants jurisdiction and, if it does, that the exercise of jurisdiction under the statute is consistent with the Constitution." Daynard, 290 F.3d at 52; Adelson, 510 F.3d at 48.[6]

The First Circuit "has sometimes treated the limits of Massachusetts's long-arm statute as coextensive with those of the Due Process Clause." Copia Commc'ns, LLC v. AMResorts, L.P., 812 F.3d 1, 4 (1st Cir.2016) (citing Daynard, 290 F.3d at 52). Recently, however, the First Circuit has "suggested that Massachusetts's long-arm statute might impose more restrictive limits on the exercise of personal jurisdiction than does the Constitution." Id. (citing Cossart v. United Excel Corp., 804 F.3d 13, 18–19 (1st Cir.2015)). Despite this suggestion, where the parties do not challenge the application of Massachusetts's long-arm statute, courts consider "any argument that the long-arm statute does not reach as far as the Fifth Amendment allows" waived, and "proceed directly to the constitutional inquiry." Id.; see also C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 65 (1st

---

**6.** When the underlying action is based on a federal statute, courts apply state personal jurisdiction rules if the federal statute does not provide for national service of process. See Lorelei Corp. v. Cty. of Guadalupe, 940 F.2d 717, 719–20 (1st Cir.1991); Sea Tow Servs. Int'l, Inc. v. Pontin, 472 F.Supp.2d 349, 358 (E.D.N.Y.2007) (internal quotation marks and alterations omitted). The Lanham Act does not provide for national service of process. See Sea Tow Servs., 472 F.Supp.2d at 358. Federal courts also apply state personal jurisdiction rules when exercising diversity jurisdiction. See Daynard, 290 F.3d at 51. Thus, Massachusetts rules govern here.

Cir.2014). Here, neither party discusses the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3, so the Court proceeds directly to the constitutional analysis.

■■■■■ "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471–72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); Daynard, 290 F.3d at 52. Due Process requires that out-of-state defendants have sufficient minimum contacts with Massachusetts such that the exercise of specific personal jurisdiction will "not offend traditional notions of fair play and substantial justice." Daynard, 290 F.3d at 52 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Specific personal jurisdiction is determined under a three-prong test:

> (1) whether the claim directly arises out of, or relates to, the defendant's forum state activities; (2) whether the defendant's in-state contacts represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable; and (3) whether the exercise of jurisdiction is reasonable.

C.W. Downer, 771 F.3d at 65 (internal quotation marks and alterations omitted).

■■■■■ The relatedness prong is a "flexible, relaxed standard," which "requires the plaintiff to show a demonstrable nexus between its claims and the defendant's forum-based activities, such that the litigation itself is founded directly on those activities." Id. at 66 (internal quotation marks and alterations omitted). In contract cases, courts "evaluate the parties' 'prior negotiations and contemplated future con-

sequences, along with the terms of the contract and the parties' actual course of dealing' to determine whether the defendants purposefully established minimum contacts." Daynard, 290 F.3d at 52 (quoting Burger King, 471 U.S. at 479, 105 S.Ct. 2174). The purposeful availment requirement focuses on "voluntariness and foreseeability." Astro–Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 10 (1st Cir. 2009). Finally, to determine whether "Massachusetts's assertion of jurisdiction is fair and reasonable," courts consider the five "gestalt" factors:

> (1) the defendant's burden of appearing in the forum state, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

C.W. Downer, 771 F.3d at 69 (internal quotation marks, citations, and alterations omitted).

**B. Personal Jurisdiction over Ms. Harris and TFL Fishers**

Here, Ms. Harris does not challenge whether the claim is related to her activities in Massachusetts. As discussed in more detail below, Ms. Harris had an "ongoing connection" with GISFW in Massachusetts as part her performance of the franchise agreement. C.W. Downer, 771 F.3d at 66. GISFW's claims "arise from the alleged breach of that contract. That is enough to establish relatedness." Id.

■■■■ Instead, she focuses her arguments on the purposeful availment prong and the gestalt factors. More specifically, she contends that the Court lacks personal jurisdiction because she does not reside in Massachusetts, her franchise was located

in Indiana, and she only spent five days in the Commonwealth in 2013 for GISFW Franchise School. With respect to the gestalt factors, she alleges that appearing in Massachusetts would impose a severe financial burden on her, and that the Indiana Deceptive Franchise Practices Act, Ind. Code § 23–2–2.7–1, governs at least some aspects of the case. These arguments ultimately fail because the facts of this case are remarkably similar to the facts of Burger King, 471 U.S. at 464–69, 105 S.Ct. 2174, in which the Supreme Court held that it did not offend traditional notions of fair play and substantial justice for a Florida court to exercise specific jurisdiction over a Michigan-based franchisee.

In Burger King, a Florida-based franchisor filed suit against a Michigan-based franchisee for breach of the franchise agreement and trademark infringement. Id. at 468–69, 105 S.Ct. 2174. The defendants were residents of Michigan, and had "no physical ties" with the State of Florida, other than attending a "brief training course" in Miami at the start of the franchise relationship. Id. at 479, 105 S.Ct. 2174. In holding that the Florida court had personal jurisdiction, the Supreme Court emphasized that the "franchise dispute grew directly out of a contract which had a substantial connection with that State." Id. (internal quotation marks and citations omitted). The defendants "deliberately reached out beyond Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." Id. at 479–80, 105 S.Ct. 2174 (internal quotation marks and citations omitted).

Furthermore, the franchise agreement and relationship "envisioned continuing and wide-reaching contacts with Burger King in Florida." Id. at 480, 105 S.Ct. 2174. The Burger King franchise agreement pro-vided that it was governed by Florida law, and called for the "payment of all required fees and forwarding of all relevant notices to the Miami headquarters." Id. at 466, 105 S.Ct. 2174. The Supreme Court explained that, although the choice-of-law provision "standing alone would be insufficient to confer jurisdiction," when combined with the long-term, interdependent relationship that the franchisee established with the franchisor, "it reinforced his deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." Id. at 482, 105 S.Ct. 2174.

The Court noted that Florida had a "legitimate interest" in holding the defendant "answerable on a claim related to contacts he had established in that state." Id. at 482–83, 105 S.Ct. 2174. Although the defendant "argued at some length that Michigan's Franchise Investment Law" governed aspects of the franchise relationship, the defendant failed to demonstrate "how Michigan's acknowledged interest might possibly render jurisdiction in Florida unconstitutional." Id. at 483, 105 S.Ct. 2174 (emphasis in original). Finally, the Court explained that "to the extent that it is inconvenient for a party who has minimum contacts with a forum to litigate there, such considerations most frequently can be accommodated through a change of venue." Id. at 483–84, 105 S.Ct. 2174.

Similarly, here, Ms. Harris deliberately reached out to GISFW in Massachusetts to negotiate for the purchase of a long-term franchise on behalf of herself and TFL Fishers, LLC. The initial contract term was for seven years, and the franchisee could renew for two additional periods of five years each. Ms. Harris had no physical ties with Massachusetts, other than attending five days of training at GISFW's corporate office in Needham, Massachusetts, at the start of the franchise relationship in 2013. Yet, the present

dispute over the franchise agreement and trademark grew directly out of a contract, which had a substantial connection with Massachusetts.

Like the contract at issue in Burger King, the TFL Fishers franchise agreement included a choice-of-law provision stating that the agreement "shall be governed by the laws of the State of Massachusetts." Docket No. 50, Ex. 1 ¶ 19(g). The contract further provided for the payment of all required fees, including the $14,500 initial transfer fee and the weekly royalty fees, to GISFW in Needham, Massachusetts. Section 23 of the agreement states that all required notices must be "personally delivered or mailed" to GISFW's corporate office in Needham. Id. ¶ 23. Finally, the agreement required Ms. Harris to attend annual meetings in Massachusetts, although she failed to actually attend. She did engage in ongoing communication and training with the Needham office throughout the two-year period during which she operated as a GISFW location.

Although Ms. Harris may have claims against GISFW under the Indiana Deceptive Franchise Practices Act, she has failed to demonstrate how Indiana's interest renders jurisdiction in Massachusetts unconstitutional. Her arguments about the grave inconvenience she will face if the case proceeds in Massachusetts are better addressed in the context of venue. I find that the Court has specific personal jurisdiction over Ms. Harris and TFL Fishers, LLC.

## C. Personal Jurisdiction over Fit Chicks

■ The above analysis, however, does not apply to Fit Chicks, LLC. Fit Chicks has not yet appeared in this case. Neither Fit Chicks nor its owner, Constance Harris, have had any interactions with GISFW, let alone entered into a long-term contractual relationship with the plaintiff

in Massachusetts. Constance Harris lives in Atlanta, Georgia, and Fit Chicks is registered and located in Fishers, Indiana. There is no evidence that Constance Harris has ever set foot in the state of Massachusetts.

The plaintiff's only argument that the Court has personal jurisdiction over Fit Chicks is that the Court should exercise "pendent personal jurisdiction" because the claims against Fit Chicks arise out of a common nucleus of operative facts as the claims against Ms. Harris and TFL Fishers, LLC. GISFW cites to Action Embroidery Corp. v. Atlantic Embroidery, Inc., 368 F.3d 1174, 1180 (9th Cir.2004), to support the proposition that the Court can "assert pendent personal jurisdiction over any individual Defendant for whom an independent basis of personal jurisdiction does not exist." Docket No. 18 at 11. This argument is a heavy lift.

■ GISFW's reliance on Action Embroidery is misplaced. In Action Embroidery, the Ninth Circuit held that a district court may exercise pendent personal jurisdiction over additional state-law claims against a defendant when those claims arise out of a common nucleus of operative facts with a claim over which the court has personal jurisdiction under a federal statute establishing nationwide service of process, such as the Clayton Act. 368 F.3d at 1180–81 ("Pendent personal jurisdiction is typically found where one or more federal claims for which there is nationwide personal jurisdiction are combined in the same suit with one or more state or federal claims for which there is not nationwide personal jurisdiction."). The doctrine of pendent personal jurisdiction allows a court to exercise personal jurisdiction over additional claims against a single defendant, not over additional defendants. See id. The doctrine is inapplicable here because GISFW cites no case law that sup-

ports "pendent personal jurisdiction" over additional defendants, as opposed to additional claims. Therefore, the plaintiff has failed to meet its burden to show that the Court has personal jurisdiction over Fit Chicks, LLC.

## III. Venue

▮▮▮ The question of whether venue is "wrong" or "improper" is governed by 28 U.S.C. § 1391. Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Tex., —— U.S. ——, 134 S.Ct. 568, 577, 187 L.Ed.2d 487 (2013). When venue is challenged on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(3), "the court must determine whether the case falls within one of the three categories" in § 1391(b). Id. Section 1391(b) states:

A civil action may be brought in—

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). If the case does not fall into one of these categories, venue is improper and "the case must be dismissed or transferred under § 1406(a)." Atl. Marine, 134 S.Ct. at 577. "Whether the parties entered into a contract containing a forum-selection clause has no bearing on whether a case falls into one of the categories of cases listed in § 1391(b)." Id.

▮▮▮ Under 28 U.S.C. § 1391, venue may be proper in more than one district. See Astro–Med, 591 F.3d at 12; Uffner v. La Reunion Francaise, 244 F.3d 38, 42 (1st Cir.2001). The Court need only determine whether venue is proper in Massachusetts, not whether Massachusetts is the "best" venue. Astro–Med, 591 F.3d at 12. In cases involving multiple claims and defendants, the plaintiff bears the burden of demonstrating that venue is proper with respect to each claim and each defendant. See Stars for Art Prod. FZ, LLC v. Dandana, LLC, 806 F.Supp.2d 437, 447–48 (D.Mass. 2011); Basile v. Walt Disney Co., 717 F.Supp.2d 381, 386 (S.D.N.Y.2010); Bearse v. Main St. Invs., 170 F.Supp.2d 107, 116 (D.Mass.2001). If venue is not proper for all of the claims and defendants, the Court may (1) dismiss the action pursuant to 28 U.S.C. § 1406(a), (2) transfer the entire case to another district where venue is proper for all claims and defendants, or (3) sever the claims in the case, retain jurisdiction over those for which venue is proper, and transfer the other claims. See Cottman Transmission Sys. v. Martino, 36 F.3d 291, 296 (3d Cir.1994); Stars for Art Prod., 806 F.Supp. at 448–49; Overland, Inc. v. Taylor, 79 F.Supp.2d 809, 812–13 (E.D.Mich.2000).

▮▮▮ GISFW argues that venue is proper in Massachusetts under the second § 1391(b) category because "a substantial part of the events or omissions giving rise to the claim occurred" in the Commonwealth.[7] Ms. Harris retorts that the events giving rise to the claim took place in Indiana. The First Circuit "takes a holistic view of the acts underlying a claim" in

---

7. The first § 1391(b) category does not apply because the defendants do not all reside in Massachusetts. Under 28 U.S.C. § 1391(c), a natural person resides for venue purposes "in the judicial district in which that person is domiciled." 28 U.S.C. § 1391(c)(1). Ms. Harris is domiciled in Indiana, and is thus a resident of Indiana for venue purposes.

determining whether the second category applies, and looks to "the entire sequence of events underlying the claim," as opposed to "a single triggering event prompting the action." Astro–Med, 591 F.3d at 12 (internal quotation marks and citations omitted); Uffner, 244 F.3d at 42. The First Circuit also does "not focus on the actions of one party." Astro–Med, 591 F.3d at 12.

The case law offers conflicting approaches on how to determine where a substantial part of the events or omissions giving rise to the claims occurred in this case, and there are no First Circuit cases directly on point. In the typical federal trademark infringement case involving a non-licensee third party, courts hold that venue is proper under § 1391(b)(2) where the infringement is alleged to have occurred and where confusion of the purchasers is likely to result. See, e.g., Goya Foods Inc. v. Oy, 959 F.Supp.2d 206, 217 (D.P.R.2013); Gary Scott Int'l, Inc. v. Baroudi, 981 F.Supp. 714, 717–18 (D.Mass. 1997). To determine where confusion is likely, "courts have focused on the absence or presence of advertising and sales in the district." Gary Scott, 981 F.Supp. at 717–18.

Under this approach, venue for GISFW's trademark infringement claims is only proper in Indiana. The alleged infringement took place at the Fishers studio, and the defendants have only engaged in advertising and sales in Indiana. Thus, any confusion on behalf of purchasers would also occur in Indiana. The plaintiff has not alleged that confusion is likely in Massachusetts.

■■■■ Instead, GISFW argues that a substantial part of the events or omissions giving rise to the claims occurred in Massachusetts because the TFL Fishers franchise agreement is at "the center of the matter at hand." Docket No. 34 at 12. For breach of contract claims, courts look to "a number of factors, including where the contract was negotiated or executed, where it was to be performed and where the alleged breach occurred" to determine whether venue is proper in Massachusetts. Pesmel N. Am., LLC v. Caraustar Indus., Inc., 754 F.Supp.2d 168, 175 (D.Mass. 2010); see also Art Tech. Grp., Inc. v. Puritan's Pride, Inc., 716 F.Supp.2d 93, 105 (D.Mass.2010). The § 1391(b)(2) venue analysis for contract law claims turns on many of the same factors relevant to personal jurisdiction. Pesmel, 754 F.Supp.2d at 175. For example, in holding that venue was proper for a breach of contract claim in Massachusetts, the Pesmel court emphasized:

> 1) the defendant faxed the Agreement to the plaintiff in Massachusetts for the plaintiff's signature, 2) the defendant repeatedly communicated by phone, mail and fax to the plaintiff in Massachusetts, 3) payments were made into Massachusetts, 4) there was an ongoing contractual relationship between the parties and 5) the contract was terminated through correspondence directed to Massachusetts.

Id. Similarly, here, Ms. Harris sent the signed franchise agreement to GISFW in Massachusetts, frequently communicated with GISFW in Massachusetts, made payments to GISFW in Massachusetts, had an ongoing contractual relationship with GISFW, and attempted to terminate the franchise agreement through an email directed to Massachusetts. Thus, venue for GISFW's contract law claims is proper in this District.

The Third Circuit has addressed the issue of venue in a case alleging both Lanham Act and breach of contract claims in the context of an alleged breach of a covenant not to compete in a franchise agreement. See Cottman Transmission Sys., Inc. v. Martino, 36 F.3d 291 (3d

Cir.1994). The <u>Cottman</u> court considered the contract law factors discussed above, with a focus on the "nature of the dispute." <u>Id.</u> at 295–96. The court held that venue did "not lie in a district where the individual defendant did not conduct his business and did not carry out any infringing activities," and transferred the case from the Eastern District of Pennsylvania to the Eastern District of Michigan. <u>Id.</u> at 292, 297.

<u>Cottman</u> is distinct from the present case because, in <u>Cottman</u>, the contract law factors indicated that venue was not proper in the challenged forum. The franchise agreement at issue stated that it was deemed to have been executed in Michigan—not Pennsylvania, where the plaintiff filed suit—and that it should be "construed in accordance with the law of that state." <u>Id.</u> at 295. The court emphasized that "the sole event in the Eastern District of Pennsylvania of possible relevance" to the venue analysis was the "preparation of advertisements for the Michigan Bell yellow pages," an event related to the trademark infringement claim. <u>Id.</u> In contrast, here, the contract law factors indicate that venue is proper in Massachusetts for GISFW's state law claims.

More recently, several district courts have held that venue is proper in the district in which a franchisor or licensor is located for breach of contract and Lanham Act claims when there is a close nexus between the franchise or license agreement and the alleged trademark infringement. <u>See</u> <u>Pearle Vision, Inc. v. N.J. Eyes, Inc.</u>, No. 08–cv–190, 2009 WL 73727, at *7 (S.D.Ohio Jan. 6, 2009); <u>California Closet Co. v. Ebben</u>, No. C 08–0625, 2008 WL 1766767, at *7 (N.D.Cal. Apr. 15, 2008); <u>Sea Tow Servs.</u>, 472 F.Supp.2d at 365–66. In <u>Sea Tow Services</u>, the court distinguished "infringement claims asserted against a former licensee" from "trademark infringement by a non-licensee third

party." 472 F.Supp.2d at 365 n. 8. The court explained that in the context of a suit against a former licensee, acts giving rise to the trademark claims include:

> the formation of the Agreement granting defendants license to use Sea Tow marks and trade dress, the issuance of the Notice of Termination by Sea Tow that terminated defendants' license, the conduct of defendants that bears upon the contested validity of that Notice, and the receipt by defendants of correspondence from plaintiff's headquarters in New York regarding termination of the Agreement and requesting that defendants cease to use Sea Tow marks and trade dress.

<u>Id.</u> at 365.

Similarly, in <u>Pearle Vision</u>, the court emphasized that "trademark infringement, false designation of origin, and unfair competition claims should not be analyzed in a vacuum. They arise from the same series of transactions and occurrences as the breach of contract claims." 2009 WL 73727, at *7. The court held that in light of the payments from the franchisee to the franchisor in the district at issue, and the correspondence from the franchisee to the franchisor in the district, "a substantial portion of the entire sequence of events giving rise to the trademark claims" arose in the district, such that venue was proper. <u>Id.</u>

Here, the question of proper venue for the entire litigation is far from clear. Taking a holistic view of the substantial acts and omissions underlying the dispute between the parties, I conclude that the breach of the franchise agreement is at the center of the dispute. Accordingly, I conclude that venue is proper in this District for purposes of the breach of contract claims and the request for a preliminary injunction. However, given that any confusion on behalf of purchasers occurred in

Indiana—where the Fit Chicks studio is located and all sales and advertising took place—venue for the trademark infringement claims is only proper in Indiana. As will be discussed in more detail below, the Court transfers the entire case to the Southern District of Indiana under 28 U.S.C. § 1404(a) and § 1406(a).

## IV. Preliminary Injunction

GISFW moves for a preliminary injunction (1) enjoining the defendants from operating a competing business in violation of section 13 of the franchise agreement, (2) prohibiting the defendants from using GISFW's confidential information in the operation of a competing business, and (3) prohibiting the defendants from using GISFW marks in the promotion of a competing business. Given that the Court only has personal jurisdiction over Ms. Harris and TFL Fishers, LLC, and that venue is only proper with respect to the contract law claims, I will only consider entering a preliminary injunction against Ms. Harris to enforce the covenant not to compete in the franchise agreement. In order to secure a preliminary injunction, a plaintiff must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir.2011) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). "A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right."

Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 8–9 (1st Cir.2012).

While the district court must weigh all four of the above factors, courts place particular emphasis on the first requirement: the plaintiff's likelihood of success on the merits. Id. at 8–9; Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 115 (1st Cir.2006). "[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). To establish a likelihood of success on the merits, the district court need only determine the "probable outcomes" of the underlying claims. See Maine Educ. Ass'n Benefits Trust v. Cioppa, 695 F.3d 145, 158 (1st Cir.2012).

### A. Likelihood of Success on the Merits

To prove its underlying breach of contract claim, GISFW must show (1) the existence of a valid, binding contract, (2) that the defendant breached the terms of the contract, and (3) that the plaintiff has sustained damages from the breach. Brooks v. AIG SunAmerica Life Assurance Co., 480 F.3d 579, 586 (1st Cir.2007).[8] GISFW argues that Ms. Harris has breached the notice of sale and termination provisions of the franchise agreement, including the covenant not to compete in section 13. "Non–Competition Agreements are enforceable only if they are 'necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public

---

8. The Court applies Massachusetts law because the choice-of-law provision in the franchise agreement selects Massachusetts law, and neither party has argued that Indiana law governs the preliminary injunction analysis. The Court leaves it to an Indiana court to decide whether the choice-of-law provision, or any other provision of the franchise agreement, is in conflict with Indiana law such that Indiana law should instead govern under the Indiana Addendum to the franchise agreement.

interest.'" Lombard Med. Techs., Inc. v. Johannessen, 729 F.Supp.2d 432, 438 (D.Mass.2010) (quoting Boulanger v. Dunkin' Donuts Inc., 442 Mass. 635, 815 N.E.2d 572, 577 (2004)); see also 7–Eleven, Inc. v. Grewal, 60 F.Supp.3d 272, 282 (D.Mass.2014). Here, the covenant not to compete in the franchise agreement satisfies all three conditions.

### 1. Existence of a Valid, Binding Contract

#### a. Legitimate Business Interests

Courts "will not enforce non-competition agreements meant solely to protect employers from run-of-the-mill business competition." Lombard, 729 F.Supp.2d at 439 (citing Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 310 N.E.2d 915, 920 (1974)). However, "the protection of trade secrets, other confidential information, and the good will the employer has acquired through dealings with his customers constitute legitimate business interests." Id. (internal quotation marks, alterations, and citations omitted). Customer goodwill is "a company's positive reputation in the eyes of its customers or potential customers" and "is generated by repeat business with existing customers or by referrals to potential customers." N. Am. Expositions Co. Ltd. P'ship v. Corcoran, 452 Mass. 852, 898 N.E.2d 831, 846 (2009).

Here, the covenant not to compete was designed to protect GISFW's trade secrets, confidential information, and customer goodwill. When Ms. Harris first began operating as a GISFW studio, she received confidential information about operating a small group fitness studio for women under the GISFW model. GISFW provided her with copies of its confidential operating manuals, along with other training materials. Ms. Harris specifically acknowledged in the franchise agreement that she obtained "knowledge of proprietary matters, techniques, and business

procedures of Franchisor that are necessary and essential to the operation of the Studio," which she did not know prior to execution of the contract. Docket No. 50, Ex. 1 ¶ 10(a).

Ms. Harris argues that the non-compete clause does not protect GISFW's goodwill because any goodwill associated with GISFW in Indiana was the result of her own efforts, as opposed to the plaintiff's. She cites to a recent Massachusetts Superior Court case, in which the court denied GISFW's motion for a preliminary injunction to enforce the non-compete clause in the franchise agreement against another former franchisee. See Get In Shape Franchise, Inc. v. Hamilton Shape Up, LLC, No. 2015-01940-B (Mass. Sup. Ct. Dec. 22, 2015). In Hamilton Shape Up, the court found that the record was "too sparse" for the court "to be confident that the requested injunction would protect Get in Shape's goodwill." Id. at 11.

Hamilton Shape Up, however, differs from the present case. The franchisee had operated a women's fitness studio at a different location prior to assuming operation of the GISFW studio. Id. at 11-12. After terminating the franchise agreement, the franchisee moved back to its former location and resumed operation of the original studio. Id. at 6, 11. The court emphasized that "a substantial number or percentage of Shape Up's client/customers may have been client/customers" from the original studio that predated the franchise agreement. Id. at 12.

In contrast, here, Ms. Harris did not operate a fitness studio at any other location prior to becoming a GISFW franchisee, and she did not move to a different location before beginning to operate as Fit Chicks. She acknowledges that the vast majority of the studio's clients from the time when it operated as a GISFW loca-

tion became Fit Chick clients after the transition, at least for some period of time.

### b. Reasonable Scope

 The non-compete clause is also reasonable in both temporal and geographic scope under Massachusetts law. With respect to temporal scope, "courts have upheld non-compete terms significantly longer than one year." Aspect Software, Inc. v. Barnett, 787 F.Supp.2d 118, 128 (D.Mass.2011) (collecting Massachusetts cases). "A geographic restriction is reasonable as long as it restricts a former employee from doing business in an area in which the company itself conducts business." Marcam Corp. v. Orchard, 885 F.Supp. 294, 299 (D.Mass.1995). The Massachusetts Supreme Judicial Court specifically upheld a two-year clause in a franchise agreement with a geographic limit of five miles from any other franchise location in Boulanger, 815 N.E.2d at 579–80. The court concluded that the five-mile limit was reasonable because a number of its previous cases had held larger geographic areas to be reasonable, and the covenant not to compete was protecting the entire franchise system. Id. at 581. The court emphasized that the franchise "system is part of what the plaintiff, as a franchisee, purchased and what protected him while he was a franchise owner." Id.

The GISFW franchise agreement similarly prohibits Ms. Harris from engaging in or being employed by "any fitness center, health club, personal training studio, or any other business concepts that directly compete with Get In Shape For Women® within an 8 mile radius" of the studio location, or any other GISFW studio, for two years following termination of the agreement. Docket No. 50, Ex. 1 ¶ 13(b). The covenant was likewise designed to protect the GISFW franchise system that Ms. Harris chose to buy into.

Furthermore, the franchisor at issue in Boulanger, Dunkin' Donuts, had approximately 3,700 stores in the United States, with more than 700 stores in Massachusetts alone. Here, there is only one other GISFW franchise location in Indiana, and only 87 across the entire country. Therefore, the covenant not to compete imposes a less significant restriction on Ms. Harris's liberty to be employed by or own a competitive business than the covenant at issue in Boulanger. I find that the restriction is reasonably limited in both time and space.

### c. Consonant with the Public Interest

 Finally, the public has a legitimate interest in ensuring that legally enforceable contracts are enforced. Harlan Labs., Inc. v. Campbell, 900 F.Supp.2d 99, 110 (D.Mass.2012). While the enforcement of any covenant not to compete temporarily restricts the freedom of employees, "that alone is insufficient to abrogate a contract or render such covenants unenforceable." Bio–Imaging Techs., Inc. v. Marchant, 584 F.Supp.2d 322, 330 (D.Mass.2008). Here, the non-compete clause does not offend the public interest because Ms. Harris knowingly agreed to reasonable restrictions on her post-franchise employment options in exchange for the benefits of participating in a franchise system. Ms. Harris did not previously operate a fitness studio, and her knowledge of studio practices and procedures came, at least in part, out of her relationship with GISFW. The Court finds that enforcing such a bargain is consonant with the public interest.

### 2. Breach by Defendant and Harm to Plaintiff

 GISFW has also shown that Ms. Harris likely breached the franchise agreement. Ms. Harris does not dispute that she failed to comply with all the termination procedures outlined in section 18. Section 18 states that the franchisee must cease

using the GISFW system and "confidential methods, procedures, descriptions of products, and techniques;" turn over all customer lists, records, and files; cease holding itself out as a present or former GISFW franchisee; and comply with the covenant not to compete. Docket No. 50, Ex. 1 ¶ 18. Section 18 also grants GISFW the right to purchase "any or all inventory, equipment, supplies, signs, advertising materials, and items bearing Franchisor's Names and Marks, at fair market value," and to assume the lease for the studio location. Id. ¶ 18(f)-(g).

Ms. Harris admits that she did not even consider contacting GISFW before selling the studio inventory and equipment—including exercise machines, dumbbells, weights, and a desktop computer—to her sister for $1. She did not obtain GISFW's prior approval or provide it the opportunity to buy the equipment or assume the lease for the studio location. Furthermore, her actions in serving as a full-time, volunteer manager at Fit Chicks violate the covenant not to compete.

Section 13 of the franchise agreement prohibits the franchisee from engaging in or being employed by "any fitness center, health club, personal training studio, or any other business concepts that directly compete with Get In Shape For Women® within an 8 mile radius" of the Fishers studio or any other GISFW studio for two years following termination of the agreement. Docket No. 50, Ex. 1 ¶ 13(b). Section 13 further prohibits "[a]ssisting in starting any new business in competition with [GISFW]" and "[s]oliciting franchisees or clients from [GISFW]." Id. By registering Fit Chicks with the State of Indiana before terminating the franchise agreement with GISFW, developing the Fit Chicks workout program, volunteering at the Fit Chicks studio roughly forty hours per week as a manager, and servicing former GISFW clients, Ms. Harris has, at the least, assisted in starting a new business in violation of section 13.

Ms. Harris argues that Fit Chicks is not a competing business because there are no other GISFW studios within an eight-mile radius of the Fit Chicks studio. However, GISFW wants to resume operation of the Fishers studio as a GISFW location as soon as possible. Both parties agree that at least some, if not most, of the studio's clients from the time when it operated as a GISFW location became Fit Chick clients after the transition. Ms. Harris also submitted an affidavit from the owner of a nearby GISFW studio in Carmel, Indiana, who states that some of the former clients of the Fishers location have joined the Carmel studio. While this exodus mitigates against the harm to GISFW, it also proves that Fit Chicks is in direct competition with GISFW.

### 3. Alleged Material Breach by GISFW

Finally, Ms. Harris argues that GISFW is not likely to succeed on the merits because it materially breached the franchise agreement before she ceased operating as a GISFW location, excusing her nonperformance with the termination provisions and covenant not to compete. As evidence of this breach, Ms. Harris again cites to Get In Shape Franchise, Inc. v. Hamilton Shape Up, LLC, No. 2015-01940-B (Mass. Sup. Ct. Dec. 22, 2015). In denying GISFW's motion for a preliminary injunction, the Hamilton Shape Up court noted that the defendant was one of thirty-one GISFW franchisees who filed a demand for arbitration with the American Arbitration Association on October 9, 2015. Id. at 4. The demand claims that GISFW has charged unauthorized fines, fees, and expenses that constitute a material breach of the franchise agreement. Id. at 5. The Hamilton Shape Up court explained that the "shear number of complaining franchisees" gave the court "more pause than

would a single complaining franchisee." Id. at 10.

Unlike the defendant in Hamilton Shape Up, Ms. Harris is not among the thirty-one franchisees who commenced an arbitral proceeding against GISFW. Ms. Harris has indicated that she does not intend to join the group arbitration, primarily for financial reasons. Although Ms. Harris filed a copy of the demand for arbitration with the Court, she has not produced any evidence under oath demonstrating that GISFW materially breached her franchise agreement by charging her unauthorized fines or fees.

When asked about the alleged breaches by GISFW at her deposition, Ms. Harris could not recall specifics about any violations and referred opposing counsel to her briefs. In her motion to dismiss and other filings, Ms. Harris took issue with a number of fees, such as an annual conference meeting fee and monthly IT fees, which are disclosed in the franchise agreement. She has not provided the Court with records of when she was charged any of the allegedly unauthorized fees. Although Ms. Harris may be able to prove that GISFW charged her unauthorized fines and fees that constitute a material breach of the franchise agreement as the litigation proceeds, she has not yet submitted sufficient evidence to undermine GISFW's showing of a likelihood of success of the merits for its breach of contract claim.

Furthermore, as will be discussed in more detail below, the balance of the equities in the present case varies substantially from that in Hamilton Shape Up, and weighs in favor of allowing the motion for a preliminary injunction. A preliminary injunction in this case more clearly protects GISFW's goodwill because Ms. Harris did not operate a fitness studio before becoming a GISFW franchisee, and Ms. Harris will not lose her livelihood if the Court issues a preliminary injunction. The Ham-

ilton Shape Up court concluded that the franchise agreement was "not negotiated by parties of equal bargaining strength." Id. at 11. In contrast, here, Ms. Harris has an MBA from the University of Virginia, Darden School of Business. GISFW gave Ms. Harris more than ten months to review the agreement, and there is no evidence that GISFW exerted any pressure on her to sign the contract.

**B. Irreparable Harm in the Absence of Preliminary Relief**

 "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir.2004). " 'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir.2005). "[A] plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business. It is usually enough if the plaintiff shows that its legal remedies are inadequate." Ross–Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18–19 (1st Cir.1996) (citations omitted).

 As discussed above, one purpose of a non-compete clause in a franchise agreement is to protect the franchisor's customer goodwill. "[H]arm to goodwill, like harm to reputation, is the type of harm not readily measurable or fully compensable in damages—and for that reason, more likely to be found 'irreparable.' " K–Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir.1989). In Jiffy Lube International, Inc. v. Weiss Bros., 834 F.Supp. 683, 692–93 (D.N.J.1993), the court held that denying a preliminary in-

junction to enforce a covenant not to compete in a franchise agreement could lead to irreparable injury to the franchisor. The court explained that "the good will of the franchisor would be harmed by the existence of a competing service center at the very site of the former Jiffy Lube center." Id. The court emphasized that because "customers are likely to patronize businesses close to home or work," the operation of a competing business, even without the franchisor's logo, "would greatly impair the plaintiff's ability to establish another franchise in the area." Id.

■ Similarly, here, customers are likely to patronize a fitness studio that is close to home or work. The existence of a competing small-group, women's fitness studio at the location of the former GISFW studio will likely harm GISFW's goodwill and impair its ability to establish another studio in Fishers, Indiana. Thus, GISFW has met its burden of demonstrating that the denial of a preliminary injunction to enforce the covenant not to compete in the franchise agreement would cause irreparable injury.

## C. Balance of the Equities

■ Balancing harms requires the Court to weigh "the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues." Ross–Simons, 102 F.3d at 15. Ms. Harris will likely experience some hardship if the Court restricts her liberty by preventing her from volunteering as a manager for or otherwise assisting Fit Chicks in the operation of the Fishers studio for two years. That said, this case is unusual because Ms. Harris does not depend on her volunteer work at Fit Chicks as a source of income. Instead, she works as a life coach to meet her basic needs. Although she has occasionally been paid small amounts for her work as a personal trainer at the studio, she does not receive compensation for her work as a volunteer manager.

Furthermore, to the extent that Ms. Harris suffers damage from the preliminary injunction, "this harm is a predictable consequence" of her breach and misconduct. Jiffy Lube Int'l, 834 F.Supp. at 693. Ms. Harris could have avoided this harm by reaching out to GISFW before terminating the franchise agreement to consider options for closing the studio.

Meanwhile, GISFW faces harm because it wants to run a franchise location in Fishers, Indiana, and is precluded from doing so by Ms. Harris's involvement with Fit Chicks. Instead of giving GISFW the opportunity to buy the fitness equipment used in the studio and to assume the lease to the studio location—as required by the termination provisions in the franchise agreement—Ms. Harris sold all of the studio's assets to her sister for $1. She also has not yet turned over all the customer lists, records, and files from the studio to GISFW—again, as required by the termination provisions—and she continues to service at least some of GISFW's former clients. On balance, the hardships weigh in the plaintiff's favor.

## D. Public Interest

■ Finally, it is in the public interest to enforce the non-compete clause in the franchise agreement through a preliminary injunction in this case. "The public has an interest in the enforcement of valid contracts." Lombard, 729 F.Supp.2d at 443. "As a matter of long-standing Massachusetts case law, it is beneficial to the public that contracts for the partial restraint of trade should be upheld to a reasonable extent." Corp. Techs., Inc. v. Harnett, 943 F.Supp.2d 233, 245 (D.Mass.), aff'd, 731 F.3d 6 (1st Cir.2013) (internal quotation marks omitted). Plaintiff seeks nothing more than to enforce a valid, bind-

ing agreement that is reasonable in scope and necessary to prevent irreparable harm to its franchise business.

Ms. Harris argues that the injunction is not in the public interest because the Fit Chicks studio will have to close if she is enjoined from volunteering, which in turn will injure clients who have pre-paid customer contracts. However, the studio has several other paid employees on staff. The head personal trainer at the studio, Kelli Price, also serves as an assistant manager, and there are two other staff members associated with the studio: another personal trainer and an unpaid intern. Ms. Harris's sister, Constance, spends roughly ten hours a week running the business remotely as the owner of Fit Chicks. Furthermore, the plaintiff seeks to resume operation of a GISFW studio at the Fishers location as soon as possible. I therefore find that enforcing the covenant not to compete in the franchise agreement by prohibiting Ms. Harris from volunteering at the studio for two years is consonant with the public interest.

## V. Change of Venue

■ "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Although Ms. Harris has not technically moved to transfer the case under § 1404(a), she has continually pressed for a change of venue. Moreover, courts "have unanimously held that it is appropriate to transfer a case *sua sponte*" pursuant to § 1404. Lando &

Anastasi, LLP v. Innovention Toys, L.L.C., 79 F.Supp.3d 375, 376 (D.Mass. 2015) (citations omitted). Ms. Harris argues that the case should be heard in Indiana because GISFW has allegedly violated the Indiana Deceptive Franchise Practices Act, Ind. Code § 23–2–2.7–1, and Ms. Harris lacks the financial resources to defend the case in Massachusetts.[9] GISFW contends that the Court should not transfer the case to Indiana for three reasons: (1) the franchise agreement contains a forum-selection clause stating that venue shall lie in Massachusetts, (2) there is a presumption in favor of plaintiff's chosen forum, and (3) Ms. Harris has not satisfied her burden to produce evidence that overcomes this presumption.

■ The First Circuit considers the presence of a forum-selection clause a "significant factor that figures centrally" in the district court's evaluation of whether to transfer a case pursuant to § 1404(a). Astro–Med, 591 F.3d at 12–13. In Atlantic Marine Construction Co., the Supreme Court explained that the presence of a valid forum-selection clause changes the typical analysis under § 1404(a). 134 S.Ct. at 581. In the absence of such a clause, the district court "must evaluate both the convenience of the parties and various public-interest considerations." Id. The private factors relating to the convenience of the parties and witnesses include:

> relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action;

---

9. Ms. Harris alleges that she had an annual income of $24,500 in 2014 and $36,000 in 2013. See Docket No. 35 at 3. She also has approximately $45,000 in unspecified "debts," "no liquid assets other than a minor amount in a checking account," and "does not own a home." Docket No. 16 at 3. She argues that it would be "financially impossible" for her "to make multiple trips to Massachusetts to defend this case and pursue counterclaims." Docket No. 35 at 3.

and all other practical problems that make trial of a case easy, expeditious and inexpensive.

Id. at 581 n. 6 (citations and internal quotation marks omitted). "Public-interest factors may include the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; and the interest in having the trial of a diversity case in a forum that is at home with the law." Id. (internal quotation marks and alterations omitted). Ordinarily, courts weigh all the private and public factors, but "the calculus changes" when the parties have agreed to a valid forum-selection clause. Id. at 581.

■■■■ "When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." Id. The district court "must deem the private-interest factors to weigh entirely in favor of the preselected forum" because "whatever inconvenience the parties would suffer by being forced to litigate in the contractual forum as they agreed to do was clearly foreseeable at the time of contracting." Id. (internal quotation marks and alterations omitted). "As a consequence, a district court may consider arguments about public-interest factors only." Id.

■■■■ The party defying the forum-selection clause bears the burden of establishing that it should not be enforced. Id.; see also Carter's of New Bedford, Inc. v. Nike, Inc., 790 F.3d 289, 292 (1st Cir.2015) ("The burden of proof is on the party opposing the enforcement of the forum selection clause."). Furthermore, "there is a strong presumption in favor of the plaintiff's choice of forum." Astro–Med, 591 F.3d at 13. Here, Massachusetts is both the plaintiff's choice of forum and the forum selected in the franchise agreement.

That said, I find that the public interest factors weigh strongly in favor of transferring this case to Indiana. Venue is proper in the Southern District of Indiana under 28 U.S.C. § 1391(b) because "a substantial part of the events or omissions giving rise to the claim occurred" at the Fishers studio. 28 U.S.C. § 1391(b)(2). As discussed at length above, venue for the trademark claims is proper in Indiana because any confusion on behalf of purchasers occurred there. See Goya Foods, 959 F.Supp.2d at 217; Gary Scott, 981 F.Supp. at 717–18. With respect to the contract law claims, Ms. Harris signed the agreement in Indiana, made payments to GISFW from Indiana, performed her obligations under the franchise agreement at the Fishers studio, and breached the agreement in Indiana. See Pesmel, 754 F.Supp.2d at 175. Thus, the case could have been brought in Indiana in the first instance.

Indiana has a strong interest in deciding this case because the Indiana Deceptive Franchise Practices Act, Ind. Code § 23–2-2.7–1, applies to the franchise agreement. Although the contract includes a choice-of-law provision stating that Massachusetts law governs, the parties also signed an "Indiana Addendum to the Franchise Agreement." The Indiana Addendum elaborates that, notwithstanding anything to the contrary in the agreement, "the laws of the State of Indiana supersede any provisions in the offering circular, the Agreement, or the State of Incorporation law, if these provisions are in conflict with Indiana law." Docket No. 50, Ex. 1 at 130. The Indiana Addendum further specifies that "any provision in the Agreement which limits in any manner whatsoever litigation brought for breach of the Agreement will be void to the extent that [it] … violates the Indiana Deceptive Franchise Practices Law." Id. An Indiana court will be better equipped to determine whether

any provisions of the franchise agreement conflict with Indiana law, or violate the Indiana Deceptive Franchise Practices Act.

■ Furthermore, the fact that this Court lacks personal jurisdiction over Fit Chicks, and that venue for GISFW's trademark claims is only proper in Indiana, also weighs in favor of transfer.[10] In determining whether a transfer is "in the interest of justice" under § 1404(a), courts seek to avoid a multiplicity of litigation resulting from a single transaction or occurrence. See Continental Grain Co. v. Barge FBL–585, 364 U.S. 19, 25–27, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960) ("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent."); 15 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3854 (4th ed. 2015) (collecting cases).

Courts place substantial weight on this factor, and find that transfer is appropriate where there is a likelihood of substantial overlap in issues between two lawsuits pending in two different federal courts, particularly if the transferring court lacks personal jurisdiction over actual or likely defendants. See, e.g., Delong Equip. Co. v. Washington Mills Abrasive Co., 840 F.2d 843, 857 (11th Cir.1988) ("Given the judicial system's great concern with the efficient conduct of complex litigation, an important consideration in deciding appropriate venue is whether a forum can meet the personal jurisdiction and venue requirements for most or all of the defendants in a multi-party lawsuit."); Kay v. Nat'l City Mortg. Co., 494 F.Supp.2d 845, 854 (S.D.Ohio 2007); Davox Corp. v. Digital Sys. Int'l, Inc., 846 F.Supp. 144, 149

(D.Mass.1993). Some courts have further held that transfer is appropriate where it "would obviate a substantial question of personal jurisdiction and avoid jurisdictional discovery." Convergence Techs. (USA), LLC v. Microloops Corp., 711 F.Supp.2d 626, 643 (E.D.Va.2010) (internal quotation marks and citations omitted); see also Mentor Graphics Corp. v. Quickturn Design Sys., Inc., 77 F.Supp.2d 505, 512–13 (D.Del.1999).

■ As discussed above, the plaintiff's only argument that this Court has personal jurisdiction over Fit Chicks—based on a theory of pendent personal jurisdiction—falls flat. Furthermore, venue for GISFW's trademark infringement claims is only proper in Indiana. Under 28 U.S.C. § 1406(a), the "district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). In Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466–67, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962), the Supreme Court held that the language of § 1406(a) is "amply broad enough to authorize the transfer of cases" when the district court in which the plaintiff filed the case lacks personal jurisdiction over the defendant. See also W. Inv. Total Return Fund Ltd. v. Bremner, 762 F.Supp.2d 339, 341 (D.Mass.2011) (transferring case in which the court lacked personal jurisdiction over the defendants under 28 U.S.C. § 1406(a) and 28 U.S.C. § 1631). The Goldlawr Court explained that § 1406(a) is "in accord with the general purpose which has prompted many of the procedural changes of the past few years—that of removing whatever obstacles may impede an expeditious and

---

**10.** The Southern District of Indiana would have personal jurisdiction over Fit Chicks because Fit Chicks is registered in Indiana, and does business there. Fit Chicks's only studio is located in Fishers, Indiana, where it services all its clients.

orderly adjudication of cases and controversies on their merits." Goldlawr, 369 U.S. at 466–67, 82 S.Ct. 913.

Therefore, because the Court lacks personal jurisdiction over Fit Chicks, and venue for GISFW's trademark claims is improper in this District, it is appropriate to transfer the claims against Fit Chicks and the trademark law claims to the Southern District of Indiana under 28 U.S.C. § 1406(a). I find that it is in the interest of justice to also transfer the state law claims against Ms. Harris under § 1404(a), both to avoid a multiplicity of litigation from a single transaction or occurrence and because Indiana has a strong interest in applying Indiana law in this case. This conclusion is buttressed by the fact that the *pro se* defendant lacks the means to litigate in two forums. Unlike this Court, the Southern District of Indiana unequivocally has personal jurisdiction over all the defendants, and venue is proper there.

## ORDER

Ms. Harris's motion to dismiss for lack of subject matter jurisdiction, lack of personal jurisdiction, and improper venue (Docket No. 22) is **DENIED** with respect to the state law claims. The motion to dismiss for improper venue is **ALLOWED** with respect to the Lanham Act claims. The Court **ALLOWS** in part GISFW's motion for a preliminary injunction (Docket No. 6) as against Ms. Harris, and **DENIES** the motion with respect to Fit Chicks, LLC, because the Court lacks personal jurisdiction over Fit Chicks. Defendant Ms. Harris is enjoined from volunteering for, consulting for, working at, or otherwise assisting Fit Chicks in any way until July 1, 2017. Plaintiff GISFW is required to post a bond of $10,000. The Court **TRANSFERS** the case to the

Southern District of Indiana under 28 U.S.C. § 1404(a) and § 1406(a).